# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

——————————

Nº 06-CV-0968 (JFB) (AKT)

——————————

PAUL PALMIERI, UZO AKUJUO, AND THE COALITION OF LANDLORDS,
HOMEOWNERS & MERCHANTS, INC.,

Plaintiffs,

VERSUS

TOWN OF BABYLON, ET AL.,

Defendants.

——————————

MEMORANDUM AND ORDER
August 1, 2008

——————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Paul Palmieri ("Palmieri"), Uzo Akujuo ("Akujuo" or "plaintiff"), and the Coalition of Landlords, Homeowners & Merchants, Inc. (the "Coalition") brought this action, alleging claims for violations of his civil rights under 42 U.S.C. §§ 1981, 1983, and 1985, the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, and pendent state law claims.[1] Specifically, at all relevant times, Akujuo was employed by the Coalition as the Editor of the Coalition's publication known as "Freedom & Property." This lawsuit is based upon Akujuo's claims that his constitutional rights

have been violated because he has been an avid critic of the Town of Babylon and its creation of the Bureau of Administrative Adjudication (hereinafter, the "Bureau") to adjudicate alleged violations of the Town Code, as well as violations of zoning and planning regulations, and to issue civil penalties for those violations. In particular, plaintiff asserts that his rights were violated on two separate dates: (1) on January 5, 2005, when an administrative employee of the Town allegedly refused to advise him over the telephone as to when the next date upon which public hearings before the Bureau were scheduled to be held; and (2) on January 19, 2005, when he was allegedly arrested at the Bureau because he refused to leave the back of the courtroom because no proceedings were taking place at that time.

---

[1] Plaintiffs Palmieri and the Coalition stipulated to the dismissal of their claims.

Defendants Town of Babylon ("Town"), Steve Bellone ("Bellone"), Wayne R. Horesely ("Horesely"), Ellen T. McVeety ("McVeety"), Carol A. Quirk ("Quirk"), Dennis Cohen ("Cohen"), Paul J. Margiotta ("Margiotta"), the Bureau of Administrative Adjudication of the Town of Babylon (the "Bureau"), Errol Williams ("Williams"), and Eileen Augustine ("Augustine") (collectively, "defendants") now move for summary judgment on all claims.

For the reasons stated below, defendants' motion for summary judgment is granted for all federal claims. In particular, as the Court explains in detail *infra* in this Memorandum and Order, plaintiff has completely failed to set forth any evidence from which a reasonable jury could conclude that his federal constitutional rights were violated by the defendants. First, although plaintiff asserts that defendants improperly refused to provide him over the telephone on January 5, 2005 with the next hearing date of the Bureau, it is undisputed (1) that plaintiff never tried to obtain that information from the Public Information Office; and (2) in any event, on that same date (January 5, 2005), plaintiff obtained the next hearing date (January 19, 2005) through a colleague from the Coalition (who called someone at the Town) and plaintiff was present in the court on January 19, 2005, thereby suffering no harm or injury from the purported First Amendment violation. Second, although plaintiff claims he was improperly directed to leave the back of the courtroom on January 19, 2005, it is undisputed that (1) there were no litigants or members of the public in the courtroom at the time because they were in the waiting area next to the courtroom until the proceedings were ready to begin; and (2) from the time plaintiff entered the courtroom until he was asked to leave and reference was made to the waiting room, no proceedings were occurring in the courtroom and the judge and court personnel were simply "chatting." It is axiomatic that there is no constitutional right of access to an empty courtroom in which no proceeding is taking place and, thus, no First Amendment claim for denial of access to the courts can exist in the instant case. Finally, although plaintiff claims he was arrested in the back of the courtroom, it is undisputed that (1) he was never restrained in any way or told that he was under arrest; (2) he was permitted to leave the courtroom and the courthouse; and (3) he returned briefly to the courthouse later that same day. In short, based upon the undisputed facts, none of the federal claims can survive summary judgment. Moreover, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I. Background

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Thus, the Court shall construe the facts in favor of the plaintiff.[2]

---

[2] Unless otherwise noted, the facts contained below are either undisputed or the opposing party has offered no evidence to controvert such fact.

### 1. The Bureau

Pursuant to the Town Code of the Town of Babylon, the Bureau is an administrative tribunal established in or about 2004 by the Town to adjudicate alleged violations of the Town Code, as well as violations of zoning and planning regulations and to impose civil penalties for those violations. (Compl. ¶ 9.) The Town Code conferred authority on the Board to, among other things, accept pleas, hear and determine alleged violations, and to impose monetary fines and penalties not exceeding $15,000. (*Id.*) Williams was the Administrative Law Judge for the Bureau and Margiotta was the Assistant Town Attorney who handled and prosecuted the cases on behalf of the Town. (*Id.* ¶ 8.)

According to Margiotta, he had a conference room adjacent to the courtroom in which he would routinely meet with the party or the party's attorney to discuss the case. (Margiotta Dep., at 35-36.) These individuals had been issued a summons by a code enforcement officer to appear in court. (*Id.* at 19.) Once Margiotta had finished these private conferences with all of the defendants for cases on the calendar for that session, all of the defendants who needed to appear before the judge would proceed to the courtroom together and the cases on the calendar would be heard. (*Id.* at 36-39, 41-42.) According to Margiotta, once the discussions in the conference room between Margiotta and the litigants were completed and the litigants proceeded into the courtroom, the court was open to the public and anyone from the public was permitted to observe the court proceeding. (*Id.* at 42.) Margiotta testified that, prior to the litigants' entering and the commencement of the proceedings before the judge, the

courtroom was supposed to be closed and everyone, including the litigants, would be seated in a waiting room. (*Id.* at 41, 45-46.)

### 2. January 5, 2005[3]

Plaintiff is employed by the Coalition as the Editor of the Coalition's publication known as "Freedom & Property." (Pl.'s Dep., at 6.) He is a graduate of Hofstra Law School, but is not a licensed attorney. (*Id.* at 7.) Prior to January 2005, plaintiff wrote at least one article in the Coalition's publication that was critical of the Bureau and its alleged lack of due process. (*Id.* at 9-10.)

On January 5, 2005, plaintiff contacted Augustine, who was the Court Administrator for the District Court and Supreme Court and assisted with administrative matters for the Bureau, by telephone to find out the next date that the Bureau was holding hearings, so that he could attend as an observer. (*Id.* at 18; Margiotta Dep., at 10; Defendants' Rule 56.1 Statement ("Defs.' 56.1") ¶ 8.) Plaintiff gave Augustine his name. (Akujuo Dep., at 18.) Margiotta, the Deputy Town Attorney, testified that he advised Augustine that, pursuant to Town Policy, she was not to speak with reporters, but rather to direct them to the Town's Public Information Bureau.[4] (Pl.'s

---

[3] The Rule 56.1 statements submitted by the parties does not make reference to the details of the events on January 5, 2005. Therefore, because the Court must construe the facts in the light most favorable to plaintiff, the facts for that date are taken from plaintiff's deposition.

[4] There is no evidence in plaintiff's deposition or anywhere else in the record that plaintiff ever attempted to contact the Town's Public Information Bureau for the next hearing date.

Rule 56.1 Statement ("Pl.'s 56.1") ¶ 36.) According to plaintiff, Augustine told him that she was asked not to speak with him. (Pl.'s Dep., at 18.) Plaintiff could not recall what he said in response, but testified that the conversation lasted less than one minute. (*Id.* at 19.)

After plaintiff ended his call with Augustine, he told his colleague at the Coalition, Cynthia Falco ("Falco"), what had occurred and, on that same date (January 5, 2005), Falco was able to obtain the date of the next hearing of the Bureau (January 19, 2005) by contacting someone at the Town. (*Id.* at 16-17.) In particular, plaintiff testified that Falco called Augustine, who would also not give her the date, but that eventually, after several calls, Falco was able to obtain the next date from someone at the Town and relayed that information to plaintiff. (Pl.'s Dep., at 20-21.) The record is unclear as to whether Falco obtained the date of the hearing from the Town's Public Information Bureau or some other individual at the Town. However, it is undisputed that, on January 5, 2005, plaintiff became aware of the date of the next hearing on January 19, 2005 from Falco's conversation with someone at the Town.

### 3. January 19, 2005

On January 19, 2005, plaintiff went to the annex for the Town of Babylon to observe proceedings of the Bureau. (Pl.'s 56.1 ¶ 10.) Plaintiff sat down in one of the courtrooms that was unlocked at the time. (*Id.* ¶ 11.) The only people present in that courtroom during this time were Judge Williams, two court security officers, and three women.[5] (*Id.* ¶ 12.)

It is undisputed that, at the time plaintiff sat down in the courtroom, there were no hearings going on in that courtroom. (*Id.* ¶ 13.) Approximately 30 minutes after he arrived in the courtroom, one of the uniformed security officers asked plaintiff to leave the room. (*Id.* ¶ 14; Pl.'s Dep., at 27-29.) From the time plaintiff sat down until the time he was asked to leave the room, no hearings were being conducted in the courtroom. (Pl.'s 56.1 ¶ 15.) According to plaintiff, the security officer told him that there was another room he could go to and listen. (Pl.'s Dep., at 29.) At plaintiff's deposition, he testified that he refused to leave and said the following in response, "I said that I would not leave unless they had arrested me, that I had a right to be there as a reporter." (Pl.'s 56.1 ¶ 16; Pl.'s Dep., at 30.) The security officer then asked plaintiff for his business card and left, while plaintiff remained in the courtroom, where no proceedings were taking place. (Pl.'s Dep., at 30.)

Prior to any hearings before the Bureau, Margiotta would conference the upcoming matters privately in a conference room abutting his office. (Pl.'s 56.1 ¶ 17.) The courtroom is normally closed off to everyone except court personnel during the time that Margiotta is conferencing cases. (*Id.* ¶ 22.)

---

[5]  Margiotta identified two of the women as Augustine and Diane Caparso, a clerk for the Bureau. (Margiotta Dep., at 10, 19-20.) The Town of Babylon employees who were working as security at the Bureau on January 19 were Harbormaster Tim Taylor and Bay Constable Michael Diggle. (Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)

During the time that plaintiff sat in the courtroom, Margiotta was conferencing matters in a conference room.[6] (Defs.' 56.1 ¶ 18.)

At some point while Margiotta was conferencing cases in a separate room, Augustine interrupted Margiotta and advised him that there was someone sitting in the courtroom. (*Id.* ¶ 19.) Margiotta directed Augustine to tell plaintiff to wait in the waiting room with all of the other people.[7] (*Id.* ¶ 20; Pl.'s 56.1 ¶ 20.) Plaintiff again refused to leave, so Margiotta entered the courtroom to personally ask plaintiff to wait outside with everybody else. (Defs.' 56.1 ¶¶ 21, 23; Pl.'s 56.1 ¶¶ 21, 23.) Plaintiff responded to Margiotta that he would not leave the courtroom unless he was arrested. (Pl.'s 56.1 ¶ 24.) Plaintiff had already told the security officer that he would not leave the courtroom unless he was arrested. (*Id.* ¶ 25.)

The parties disagree as to the next order of events. Plaintiff states that Margiotta told the security guard to arrest Akujuo. (*Id.* ¶ 26.) Margiotta disputes such an allegation and denies asking the security guard to arrest plaintiff. (Defs.' Reply 56.1 ¶ 4.) Plaintiff testified in the deposition that the security officers did not say or do anything in response to Margiotta's alleged request that they arrest plaintiff. (Pl.'s Dep., at 33-34.)

However, both parties agree that Margiotta ultimately contacted the Suffolk County Police Department ("SCPD"). (Pl.'s 56.1 ¶ 26.) According to plaintiff, Margiotta told the SCPD, "There's an idiot from the Coalition." (Pl.'s Dep., at 36.)

Two SCPD officers subsequently arrived at the courtroom. (Pl.'s 56.1 ¶ 29.) During the period of time from when the police were called until the moment of their arrival, plaintiff was not placed in handcuffs, not told that he was not free to leave, not told that he was under arrest, and not told that he was being detained by any Town of Babylon employees in the courtroom. (*Id.* ¶ 30; Pl.'s Dep., at 33-34, 39-40**.**) During that same period, plaintiff did not attempt to leave the courtroom. (Pl.'s 56.1 ¶ 30; Pl. Dep, at. 35.) Plaintiff testified that, while they waited for the police, he and Margiotta engaged in a "heated conversation." (Pl.'s Dep., at 38.)

When the two SCPD officers arrived about 15 minutes later, one of the officers asked plaintiff to leave the premises and he did so. (Defs.' 56.1 ¶ 32; Pl.'s Dep., at 35, 44.) During the entire time from when Margiotta called the police until plaintiff left the courtroom, no hearings were conducted in the courtroom. (Pl.'s 56.1 ¶ 31). Plaintiff left the building, but he returned to the building later that day and obtained the control number from

---

[6] Although plaintiff does not appear to dispute that defendant Margiotta was conferencing cases in a conference room while plaintiff sat in the courtroom, plaintiff disputes the exact time that Margiotta came into the courtroom to speak to him. Specifically, plaintiff does not believe it was 1:30 p.m., but rather was about 2:00 p.m. (Pl.'s 56.1 ¶ 18.) However, this dispute is immaterial for purposes of the legal analysis related to the summary judgment motion.

[7] Specifically, Margiotta testified: "And she [Augustine] said that there's X amount of people in the waiting room and one person sitting in the Courtroom. I said, 'Please tell the person in the Courtroom to wait with the other people in the waiting room.'" (Margiotta Dep., at 35.)

the report of the incident by the SCPD.[8] (Pl.'s Dep., at 46.)

Plaintiff was unaware of any damage to his reputation nor was he ridiculed as a result of these events. (Pl.'s 56.1 ¶ 33.) Plaintiff did not suffer any loss of income or employment. (*Id.* ¶ 33.)

At no time on January 19, 2005 were the defendants Bellone, Horesley, McVeety, or Quirk in the courtroom at the Bureau during the time plaintiff was present. (*Id.* ¶ 34.)

## B. Procedural History

Plaintiff Akujuo filed the complaint in the instant action on March 3, 2006. On March 28, 2007, the parties stipulated, and the Court so ordered, the dismissal of plaintiffs Paul Palmieri and The Coalition of Landlords, Homeowners & Merchants, Inc.

The defendants filed a motion for summary judgment on June 25, 2007. Plaintiff filed a response on July 25, 2007 and defendants filed a reply on August 8, 2007. Oral argument was held on September 14, 2007. The Court has fully considered all the written submissions, as well as the oral argument.

---

[8] The one-page police report describes the incident as a "[d]isturbance" and notes, in part, (1) that plaintiff "was asked to leave a town proceeding which he was uninvolved in"; (2) complainant "is a town attny and states the proceeding was not open to the public" and (3) "Akujuo, a reporter for The Coalition left w/o incident." (Police Report, at 1.)

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005)*.* The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson,* 477 U.S. at 248 (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *Rivkin v. Century 21 Teran Realty LLC,* 494 F.3d 99, 103 (2d Cir. 2007). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

## III. DISCUSSION

Plaintiff brings federal claims under 42 U.S.C. §§ 1983, 1981, and 1985, as well as pendent state claims. As set forth in detail below, none of the federal claims can survive summary judgment because no reasonable jury could find in plaintiff's favor on these claims given the undisputed facts in the record.[9] As to the state claims, the Court declines to retain jurisdiction given the absence of a federal claim that survives summary judgment. The Court will address each claim in turn.

A. 42 U.S.C. § 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979). Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .

42 U.S.C. § 1983.

For claims under § 1983, a plaintiff must prove "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). The parties do not dispute that the defendants were acting under color of state law.

Plaintiff separately alleges both constitutional violations of his rights, as well as violations of his rights under § 1983. However, since § 1983 is not a source of constitutional rights, but only the method by which plaintiff's constitutional rights can be vindicated, the Court will analyze the alleged constitutional violations under the particular constitutional amendments that are asserted by

---

[9] Although Bellone, Horesely, McVeety, and Quirk are named as defendants in the federal claims, the complaint fails to contain any allegations (and certainly no evidence has been proffered) that those individuals violated any of plaintiff's constitutional rights in any way or that they were even aware of the alleged violations of his constitutional rights. At oral argument, Akujuo's attorney refused to dismiss the above-mentioned defendants from the case, yet pointed to no evidence supporting such allegations against them. (Oral Arg. Tr. 4, Sept. 14, 2007.) The lack of any allegations or evidence linking these defendants to any of the alleged unconstitutional acts in this case warrants summary judgment in their favor. To the extent that they were named in an effort to assert some type of "negligent supervision" theory of liability, such a supervisory theory of liability cannot exist in this case because the underlying federal claims against those they supervised do not survive summary judgment for the reasons discussed *infra*. Therefore, these defendants are also entitled to summary judgment. Moreover, given this ruling, the Court need not address defendants' argument that these defendants are entitled to qualified immunity.

plaintiff.[10]

[10] The Court notes that, although plaintiff references numerous potential constitutional and statutory violations in his complaint (and the defendants' motion seeks summary judgment on all claims), plaintiff only addressed the First and Fourth Amendment claims in his opposition papers. As a threshold matter, because plaintiff's opposition papers did not address defendant's motion for summary judgment on the other claims, those claims could be deemed abandoned and summary judgment could be granted on that basis alone. *See, e.g., Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03-CV-6614 (WHP), 2006 U.S. Dist. LEXIS 7368, at *7 (S.D.N.Y. Feb. 28, 2006) (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim); *see also Devito v. Barrant*, No. 03-CV-1927 (DLI), 2005 U.S. Dist. LEXIS 22444, at *10 (E.D.N.Y. Aug. 23, 2005) (same); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *Arias v. NASDAQ/AMEX Mkt. Group*, No. 00-CV-9827 (MBM), 2003 U.S. Dist. LEXIS 166, at *34-*35 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default."). However, in the exercise of its discretion, the Court will not deem the claims to be abandoned; rather, the Court addresses all claims on the merits and finds these claims, like the First and Fourth Amendment claims, fail to survive summary judgment for the reasons set forth below.

(1) First Amendment Right of Access Claim

Plaintiff contends that the January 19, 2005 incident deprived him of his constitutional right of access to the courts. As set forth below, any such right of access claim cannot survive summary judgment because it is undisputed that plaintiff was not prevented from observing any proceeding, but rather was simply asked to leave the courtroom while no proceedings were taking place.

The Second Circuit has held that "'the First Amendment does secure to the public and to the press a right of access to civil proceedings.'" *Lugosch III v. Pyramid Co. of Onondaga,* 435 F.3d 110, 124 (2d Cir. 2006) (quoting *Westmoreland v. Columbia Broad. Sys., Inc.,* 752 F.2d 16, 23 (2d Cir. 1984)). In addition, the Second Circuit has emphasized that "an identified non-party . . . who is denied access to court has and can assert a presumed right of access even if he or she is the only person excluded." *Huminski v. Corsones,* 386 F.3d 116, 142 (2d Cir. 2004); *see also ABC v. Cuomo,* 570 F.2d 1080, 1083 (2d Cir. 1977) ("We think that once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable."); *Telemundo of Los Angeles v. City of Los Angeles,* 283 F. Supp. 2d 1095, 1102 (C.D. Ca. 2003) ("Several courts have determined that discriminatory access to public forums or information is generally violative of the First Amendment.") (collecting cases). However, it is well-established that "a reporter's constitutional rights are no greater than those of any other member of the public." *Nixon v. Warner*

*Commc'ns, Inc.,* 435 U.S. 589, 609 (1978) (citation and quotation omitted); *see also United States v. Yonkers Bd. of Educ.*, 587 F. Supp. 51, 53 (S.D.N.Y. 1984) (although reporter was free to attend court proceeding in the same manner as the public, he was not constitutionally entitled to greater rights than the public by being allowed to tape the proceedings). Thus, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes,* 408 U.S. 665, 684 (1972).

Moreover, it is axiomatic that no claim can exist for denial of access to a judicial proceeding if no judicial proceeding is taking place. *See generally Kelly v. Mun. Court of Marion County,* 852 F. Supp. 724, 735 (S.D. Ind. 1994) ("A courtroom is not a debate hall or a gathering place for the public to exchange ideas; it is a forum for adjudicating the rights and duties of litigants."); *see also Sheppard v. Beerman,* 18 F.3d 147, 152 (2d Cir. 1994) (affirming dismissal of First Amendment claim where, despite alleged restrictions on plaintiff – such as directing him to examine court files outside the courtroom and to stop going in and out of courtroom – there was no allegation that plaintiff was denied access to the proceeding if he kept proper decorum); *Berlickij v. Town of Castleton,* 327 F. Supp. 2d 371, 384 (D. Vt. 2004) (holding that executive sessions of town selectboard were not public fora and, thus, administrator's exclusion from meeting did not violate First Amendment), *aff'd,* No. 04-5369-CV, 2005 WL 2114090, at *2 (2d Cir. Sept. 2, 2005); *Cathedral Church of the Intercessor v. Inc. Village of Malverne,* 353 F. Supp. 2d 375, 388 (E.D.N.Y. 2005) (dismissing claim for interference with access to the courts where, among other things, there was no claim of actual injury resulting from defendants'

actions).

In the instant case, the undisputed evidence clearly demonstrates that plaintiff was not denied access to any proceedings at the Bureau on January 19. In particular, plaintiff concedes the following undisputed facts in his Counter 56.1: (1) "[a]t the time Uzo Akujuo sat down in the courtroom there were no hearings going on in the courtroom" (Pl.'s Counter 56.1 ¶ 13); and (2) "[f]rom the time plaintiff Uzo Akujuo sat down until the time that he was asked to leave the room, no hearings commenced (*Id.* ¶ 15). In fact, plaintiff testified that, during the time he was sitting there waiting for any proceedings to commence, Williams was "chatting" with court personnel "about the Nassau County Assessor's crackdown on illegal housing and they were also speaking about American Idol." (Akujuo Dep., at 27.) According to Margiotta, he told the plaintiff that he could not be in the courtroom prior to the commencement of the hearings, but rather had to wait in the waiting room with everyone else, and plaintiff responded that he was not leaving unless he was arrested. (Margiotta Dep., at 45-46.) Although plaintiff did not confirm the portion of the conversation with Margiotta about the waiting room, plaintiff acknowledged in his deposition that a security officer told him about the waiting room to which plaintiff could go. (Akujuo Dep., at 28-29.)

Plaintiff's counsel contended at oral argument that plaintiff was not asked to leave the courtroom, but instead was required to leave the building and not allowed to come back. That assertion is contradicted by plaintiff's own deposition testimony and other undisputed evidence in the record. First, plaintiff testified in his deposition that the court security officer told him "[t]hat there was another room I could go to and listen."

(Pl.'s Dep., at 29.) Later in the same deposition, plaintiff was asked the following about that same encounter with the security officer: "Q. Now, when you were asked *to leave the room*, did you say anything in response? A. I said that I would not leave unless they had arrested me, that I had a right to be there as a reporter." (*Id.* at 30.) (emphasis added). Plaintiff testified that, after that exchange, he walked back in the courtroom, sat down, and the security officer left. (*Id.*) Second, plaintiff gave the same testimony at the Section 50-h hearing – namely, that the officer told him to leave the courtroom and go to another room. (*See* Pl.'s Section 50-h Tr., at 34 (annexed as Ex. A to the Pforr Aff.) ("He called me out of the [court]room, and then he told me that they don't want me in here, that they said there's another room I can go and listen.").)

In plaintiff's opposition papers and at oral argument, plaintiff's counsel contended that the SCPD later forced plaintiff out of the building. (*See* Pl.'s Opp., at 5 (arguing that SCPD did so "by having an armed guard order the plaintiff to leave the courtroom" and "using the Suffolk County Police Department to force the plaintiff out of the courtroom and the building altogether"); Oral Arg. Tr., at 23 ("And then jointly the court personnel and the Suffolk County Police and Mr. Margiotta made sure not only that the plaintiff leave the courtroom, that he leave the building.").) There is absolutely no evidence in the record, from plaintiff's testimony, or any other source, indicating that he was ever required to leave the building and told he could not return. As discussed *supra,* with respect to the Fourth Amendment claim, plaintiff testified in his deposition that he was "asked to leave," but plaintiff did not specify at any point in his deposition that he was asked or forced by anyone to leave the courthouse (as opposed to

the courtroom). (Pl.'s Dep., at 44.) Plaintiff's counsel argues that being asked to "leave" by the police meant that Akujuo had to leave the building. (Oral Arg. Tr., at 35-36.) However, that conversation was clearly in the context of the earlier conversations with court security officers, in which plaintiff concedes he was asked specifically to leave the courtroom. (*Id.* at 36-37.) There is nothing in the record from which a reasonable person could conclude that plaintiff was being asked to leave the building and not return. The context of that conversation clearly indicates that the personnel wanted him to leave the courtroom in which there were no litigants and no members of the public. In fact, the contention that he was banned entirely from the building by the Suffolk County Police Department or anyone else is also contradicted by plaintiff's own deposition testimony in which he testified that he returned to the courthouse that day to get the case number assigned to the incident by the Suffolk County Police.[11] Therefore, the undisputed evidence demonstrates that plaintiff, after being asked to leave the courtroom by the security officers and then by police where no proceeding was yet taking place, left the courtroom. Although plaintiff also chose to leave the building, there is no evidence that plaintiff was banned from the building and was not going to be permitted to return to the courtroom when the members of the public and litigants were let in and a

_____

[11] The Court also notes that, not only is there no evidence that the Suffolk County Police transformed the court security officers' request that plaintiff leave the courtroom into a requirement that he leave the building, neither the Suffolk County nor their officers are even named as defendants in this lawsuit.

proceeding was taking place.[12] (Pl.'s Dep., at 46.)

In sum, plaintiff is not accorded more rights than those provided to other members of the public who had to wait outside the courtroom until the proceedings were about to commence. Given that it is undisputed that plaintiff was not asked to leave the courtroom during any actual proceeding, there is no evidentiary basis from which he can show that he was denied access to the courts. Accordingly, plaintiff's right of access claim cannot survive summary judgment.[13]

---

[12] When the Court asked plaintiff's counsel at oral argument for any evidence that plaintiff was told that he could not re-enter the courtroom with litigants and members of the public when any proceedings were actually going to take place that day, plaintiff's counsel responded that there was no evidence that they were going to let him back into the courtroom once any proceeding commenced. (Oral Arg. Tr., at 25.) Counsel later added, in explaining why his client did not attempt to re-enter the courtroom during any actual proceeding, the following: "I mean, would you do that? Would I do that? Would I come back into that caldron of hate, and all the things that are going on, and then start in all over again? Would anybody do that? I mean, I would be petrified. I would be scared to death." (*Id.* at 37.) Counsel then added, "I'm not the plaintiff. I'm just the attorney. Don't shoot the messenger." (*Id.*) Such a contention, that they would not have let plaintiff re-enter the courtroom once a proceeding before the judge actually commenced, is sheer speculation and cannot provide a basis for a denial of access claim.

[13] Plaintiff also claims a deprivation of right of access to public information on the January 5, 2005. However, summary judgment for defendants on this claim is also warranted because plaintiff ultimately received the information regarding the January 19, 2005 court date. As

(2) First Amendment Retaliation Claim

Plaintiff also claims that the events on January 5, 2005 and January 19, 2005, in which he was purportedly denied access to the Bureau hearings, were in retaliation for his published articles in the past criticizing the Town for the creation of the Bureau. In order to prevail on his First Amendment retaliation claim, plaintiff must prove the following three elements: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001); *accord Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir. 1998). Both sides agree that a reporter has the right of access to the courts and, thus, the first element is not in dispute. However, as set forth below, there is no evidence to support plaintiff's claim with respect to the second and third elements of a First Amendment retaliation claim as to either the January 5, 2005 or January 19, 2005 events and, thus, summary judgment is warranted. The Court will address each event

---

discussed in more detail *infra* in connection with the First Amendment retaliation claim, plaintiff testified in his deposition that his colleague at the Coalition called and obtained the date from someone at the Town on January 5, 2005 and relayed that information to plaintiff. (Pl.'s Dep., at 20-21.) Thus, plaintiff was not delayed in communicating with the court, nor was he unable to attend the hearing because of his alleged inability to obtain the date from Augustine. Therefore, the undisputed evidence demonstrates that he was not denied access to the courts by his failure to obtain the date in his telephone call with Augustine. Accordingly, this claim also cannot survive summary judgment.

in turn.

(a) The January 5, 2005 Telephone Call

Plaintiff has broadly alleged that, on January 5, 2005, Margiotta and Augustine violated his First Amendment rights. This claim is based upon plaintiff's telephone call on January 5, 2005 to Augustine to determine the next hearing date at the Bureau. According to plaintiff, Augustine told him that she was instructed by Margiotta not to speak with him. For the reasons set forth below, plaintiff's First Amendment claim arising from the January 5, 2005 telephone call cannot survive summary judgment because (1) there is no evidence of retaliation by the defendants in refusing to provide plaintiff with information regarding hearing dates other than through the Public Information Bureau; and (2) there is no actionable chilling or impairment of his First Amendment rights because he was readily able to obtain that information through other sources.

As a threshold matter, with respect to January 5, 2005, plaintiff has failed to set forth any evidence that the refusal of Augustine to give him the date of the next hearing by the Bureau, was in retaliation for his First Amendment speech against the Town. In particular, according to the testimony of Margiotta, Margiotta had received information from Augustine that a reporter from the publication "Freedom & Property" was contacting her and asking her for information about the Bureau. According to Margiotta, he told the employee, pursuant to the "strict Town rule," that she was not to speak to reporters and that reporters were to be directed to the Public Information Bureau to answer any questions. Plaintiff has not presented any evidence that Augustine was singling plaintiff out by refusing to give him

the information because of his speech, rather than simply following normal procedure. In other words, there is no evidence that other reporters or citizens were able to call Augustine and get this information. Moreover, even though plaintiff acknowledged that he was fully aware of the Public Information Bureau, there is no evidence that he ever attempted to contact that Bureau to get this information and was refused. Accordingly, because there is absolutely no evidence that plaintiff was treated any differently than other reporters who called to obtain this information, any First Amendment claim based upon Augustine's conduct on January 5, 2005 cannot survive summary judgment.

In any event, even assuming *arguendo* that plaintiff was treated differently from other reporters (or members of the public) when Augustine refused to give him the date of the next hearing, his First Amendment claim would still fail because the adverse impact of such conduct was objectively *de minimis* as a matter of law under the circumstances of this case based upon the undisputed facts and could not have resulted in a chilling effect on plaintiff's First Amendment rights, including his ability to access court proceedings. Specifically, plaintiff never attempted to call the Public Information Bureau to obtain the next court date and, in fact, was subsequently able to ascertain the next hearing date on January 19, 2005 and went to the Bureau on that date. Therefore, it is undisputed that he suffered absolutely no adverse impact from defendant Augustine's alleged conduct.

In reaching this decision, this Court is guided by the Second Circuit's recent decision in *Williams v. Town of Greenburgh*, No. 06-4897-civ, 2008 WL 2797004 (2d Cir. July 22, 2008). In *Williams,* the Second Circuit

affirmed the grant of summary judgment for the defendant on plaintiff's First Amendment retaliation claim under Section 1983. The Court explained that the claim failed as a matter of law because he pointed to no adverse impact to his First Amendment rights from the alleged retaliation:

> "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights – in other words, there is an injury requirement to state the claim." *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir. 2002). In *Colombo,* we explained that plaintiffs who allege a violation of their right to free speech must prove that official conduct actually deprived them of that right. *Id.* To prove this deprivation, Williams must come forward with evidence showing either that (1) defendants silenced him or (2) "defendant[s'] actions had some actual non-speculative chilling effect" on his speech. *Id.*[;] *see also Spear v. Town of W. Hartford,* 954 F.2d 63, 68 (2d Cir. 1992) (requiring plaintiff to show that defendants "inhibited him in the exercise of his First Amendment freedoms"). However, Williams has not alleged facts indicating that Bland and White have deprived Williams of his constitutionally protected right to free speech. Nor has he produced any evidence showing that defendants' actions chilled his speech or otherwise prevented him from speaking.

> \*          \*          \*

Because Williams cannot show that his speech was either silenced or

chilled – *i.e.*, that his right to free speech was actually violated – Williams' claim fails as a matter of law.

*Id.* at \*6; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir. 1999) ("[T]here is a serious question as to whether the alleged acts of retaliation, especially Smith's asserted one-day denial of an opportunity to exercise were more than *de minimis*.") (collecting cases); *Conn. State Fed'n of Teachers v. Bd. of Educ. Members,* 538 F.2d 471, 481 (2d Cir. 1976) (holding that "inconsequential," "de minimis" interference with free speech did not violate First Amendment). "Indeed, it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise. . . ." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 226 (2d Cir. 2006) (quotations and citations omitted).

Similarly, in *Baltimore Sun Co. v. Ehrlich,* 437 F.3d 410 (4th Cir. 2006), the Fourth Circuit held that no actionable retaliation claim arose when a governmental official denied a reporter access to discretionarily afforded information or refused to answer questions. The Court explained:

> "Not every [government] restriction," . . . "is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory." *DiMeglio v. Haines,* 45 F.3d 790, 806 (4th Cir. 1995). Illustrating the observation that "not every [government] restriction is sufficient to chill the exercise of First Amendment rights," we have recognized a distinction between an adverse impact that is *actionable*, on

the one hand, and a *de minimis* inconvenience, on the other. "[A] plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." *Constantine,* 411 F.3d at 500 (citation omitted). Thus, in *Wicomico County,* we held that a prison's "decision to withdraw from its special arrangement [permitting an ACLU paralegal to meet with prisoners in private] . . . may have inconvenienced Appellees, but it did not chill, impair, or deny their exercise of First Amendment rights" because the paralegal was still "free to visit with inmates in secure, non-contact meeting rooms," which was "all that [the prison] provided to any paralegal or other non-professional visitor." 999 F.2d at 786.

*Balt. Sun Co.,* 437 F.3d at 416.

Here, as in *Williams* and *Baltimore Sun Co.* and the other above-referenced cases, it is undisputed that plaintiff was able to obtain the January 19, 2005 hearing date and suffered no adverse impact that chilled, impaired, or denied his exercise of First Amendment rights to attend or to report about Bureau proceedings. *See Curly,* 268 F.3d at 73 ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). Accordingly, any First Amendment retaliation claim based on the January 5, 2005 telephone call with Augustine must fail as a matter of law.

(b) The January 19, 2005 Events

As to the events of January 19, 2005, plaintiff's retaliation claim similarly cannot survive defendants' motion for summary judgment because there is no evidentiary basis from which a reasonable jury could find that defendants's actions were motivated by or substantially caused the exercise of his First Amendment rights or that defendants' actions effectively chilled the exercise of his First Amendment right.

With respect to the second element, *i.e.,* that defendants' actions were motivated or substantially caused by the exercise of plaintiff's First Amendment rights, plaintiff has provided no evidence that any other members of the public or the press were permitted to be in the courtroom on that date (or any other date) when no court proceedings were taking place. As discussed *supra* with respect to the right of access claim, the uncontroverted evidence is that the litigants and any other members of the public were required to stay in the waiting room next to the courtroom until the proceedings in the courtroom were ready to commence. Moreover, it is also undisputed that, at the time plaintiff came into the courtroom, no litigants or members of the public were in the courtroom because no proceedings were taking place. Therefore, given these undisputed facts, there is simply no basis for a reasonable jury to conclude that plaintiff was instructed to leave the courtroom until proceedings were taking place in retaliation for some prior exercise of his First Amendment rights.

Similarly, with respect to the third element, *i.e.,* the chilling of plaintiff's First Amendment right, plaintiff has set forth no evidence of any impact from his not being allowed to stay in the courtroom until the proceedings were ready to begin. In short,

plaintiff cannot demonstrate a First Amendment injury from being denied access to a courtroom where there were no litigants and nothing was occurring other than, as plaintiff conceded, the judge and court personnel "chatting" about things like American Idol. Under *Williams*, no reasonable jury could find a First Amendment injury based upon his alleged inability to stay in the courtroom until a proceeding was to take place.

In sum, based upon the undisputed facts, the Court concludes that plaintiff's First Amendment retaliation claims, both as to January 5, 2005 and January 19, 2005, cannot survive summary judgment.

### (3) Fourth Amendment Claim: False Arrest and Detention

Although plaintiff asserts a Fourth Amendment false arrest and detention claim based upon the events in the courtroom on January 19, 2005, defendants contend that summary judgment on the Fourth Amendment claim is warranted because the undisputed facts demonstrate that plaintiff was never arrested or detained in any way on that date. As set forth below, the Court agrees with defendants and concludes that the Fourth Amendment claim cannot survive summary judgment.

In analyzing Section 1983 claims for unconstitutional false arrest, courts have generally looked to the law of the state in which the alleged arrest occurred. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (applying New York false arrest law). Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification. *See, e.g., Broughton*

*v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975), *cert. denied*, 423 U.S. 929 (1975). A Section 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures is substantially the same as a claim for false arrest under New York law. *See, e.g.*, *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996); *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992); *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991).

Plaintiff argues in his opposition brief that "it is not this Court's function to determine on a summary judgment motion whether the plaintiff's 'arrest' and detention were reasonable . . . ." (Pl.'s Resp. Br. 9.) That contention, however, completely ignores the threshold issue – namely, whether there was an arrest or detention in the first place. *See, e.g., Palmieri v. Town of Babylon,* No. 01 CV 1399 (SJ), 02 CV 6075 (SJ), 2006 WL 1155162, at *10 (E.D.N.Y. Jan. 6, 2006) (dismissing Fourth Amendment claim under Section 1983 because "[w]hile [plaintiff] appears to allege that he was unconstitutionally seized as part of the Town's enforcement of its Rental Permit Law, his attempt to allege a Fourth Amendment violation in the Complaint amounts to nothing more than conclusory statements"). In other words, if the undisputed evidence demonstrates that there was no arrest or detention, then summary judgment is warranted. As discussed below, that is precisely the situation that exists in the instant case.

As the Second Circuit has emphasized, "[i]t is well settled that '[t]he Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive

interference by enforcement officials with the privacy and personal security of individuals.'" *United States v. Hooper,* 935 F.2d 484, 490 (2d Cir. 1991) (quoting *INS v. Delgado,* 466 U.S. 210, 215 ( 1984)); *see also United States v. Lee,* 916 F.2d 814, 819 (2d Cir. 1990) ("Not every encounter between a police officer and an individual is a seizure implicating the fourth amendment's protections."). Although it is well settled that the Fourth Amendment's prohibition of unreasonable searches and seizures does not apply to every interaction between citizens and the police, a Fourth Amendment seizure occurs where a police officer "briefly detains an individual and restrains that person's right to walk away." *United States v. Moreno*, 897 F.2d 26, 30 (2d Cir. 1990), *cert. denied*, 497 U.S. 1009 (1990). More specifically, the test for analyzing whether an encounter between a police officer and a citizen constitutes a seizure is whether "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In making this determination, factors that may contribute to a reasonable apprehension that one is not free to leave include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Moreno,* 897 F.2d at 30 (quoting *Mendenhall*, 446 U.S. at 554); *accord United States v. Thompson*, 941 F.2d 66, 70 (2d Cir. 1991). However, if the police are questioning someone, and they remain free to disregard the questions and walk away, there has been no intrusion upon the person's liberty or privacy and, for Fourth Amendment purposes, there has been no seizure. *See Mendenhall*, 446 U.S. at 553. As

the Supreme Court has explained:

> "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."

*INS,* 466 U.S. at 216; *accord Moreno,* 897 F.2d at 30.

Although plaintiff thinks he was detained (Oral Arg. Tr., at 32-33), the question is not what he thought or believed, but rather whether there is any evidence from which a jury could conclude that "a reasonable person would have believed that he was not free to leave." *Mendenhall,* 446 U.S. at 554; *accord Hooper,* 935 F.2d at 491; *see also United States v. Salyers,* 160 F.3d 1152, 1159 (7th Cir. 1998) ("The test is not whether the particular defendant thought he was free to go, but whether a reasonable person in the circumstances would have believed so.") (quotations and citations omitted) (collecting cases).

In the instant case, the undisputed evidence clearly demonstrates that no restraint was ever placed on plaintiff's ability to leave the courtroom or courthouse on January 19 and, thus, no reasonable jury could conclude that he was arrested or detained under the law. Specifically, it is undisputed that (1) plaintiff was never physically restrained or touched in any way or told by anyone at any time that he was under arrest; (2) he was permitted to leave the courtroom and the courthouse; and (3) he returned briefly to the courthouse later that same day. In other words, during the entire period of time that Akujuo was in the

courtroom, including when the police arrived, it is undisputed that he was never told that he was under arrest, was never told that he was being detained, and was never told that he was not free to leave. (Defs.' 56.1 ¶ 30.) Given these undisputed facts, the only conclusion that a reasonable jury can draw is that he was free to leave at all times on that date.

To the extent that plaintiff contends that Margiotta approached him, asked him if he wanted to be arrested because of his refusal to leave the courtroom, and then told the court security officers to arrest plaintiff, those comments do not provide a sufficient basis for concluding that plaintiff was not free to leave. As a threshold matter, it is uncontroverted that Margiotta, as a Town attorney, had no ability to arrest plaintiff or direct that he be arrested. In any event, the mere threat to arrest someone, even if the threat is made by a police officer with authority to arrest (which is not the case here) does not constitute an arrest absent other circumstances. *See, e.g., Brown v. Sweeney,* 526 F. Supp. 2d 126, 132 (D. Mass. 2007) ("Generally, a mere oral threat of an arrest by a police officer absent any other factual allegations does not constitute such a 'seizure.'") (collecting cases); *see also Sterne v. Thompson*, No. 1:05 CV 477 JCC, 2005 WL 2563179, at *4 (E.D. Va. Oct. 7, 2005) ("Turning first to plaintiff's allegations that [the FBI agent] threatened to arrest him, the complaint contains no allegation that any of the defendants ever detained plaintiff in any manner or for any length of time. In other words, because the plaintiff alleges no actual arrest or even a *Terry* stop, there is no allegation of a seizure of the plaintiff's person. Where there is no search or seizure at all, the Fourth Amendment's protections are not triggered.").

Here, no evidence was provided, in

plaintiff's deposition or anywhere else in the record, that any action whatsoever was taken by the security officers to implement the alleged instruction by Margiotta. The lack of any action by those security officers is illustrated by plaintiff's deposition testimony:

Q. Did the security officer arrest you?

A. It depends. I'm not sure what that question means.

Q. Well, did he take you into custody, physical custody?

A. Again, that's not clear to me.

Q. Did he place handcuffs on you?

A. No.

Q. Did he tell you you weren't free to leave?

A. No.

Q. Did he move you to another area?

A. No.

Q. Did he ever use the phrase, "You're under arrest"?

A. Not to my recollection.

Q. Did he ever use the phrase, "I'm detaining you."?

A. I don't remember him saying that.

Q. After Mr. Margiotta, told the security officer to arrest you did the security say anything to you?

A. I don't remember hearing anything.

\* \* \*

Q. Now, when you say were upset about being arrested, what was it that made you conclude you were arrested?

A. That the security officer with a gun to his side had been told to arrest me.

Q. Did you ever ask the security officer whether you were under arrest?

A. No.

(Pl.'s Dep., at 33-34, 40.)

Instead of the security officers taking any action, the SCPD were called and, as discussed above, the police also did nothing to arrest plaintiff when they arrived; rather, plaintiff went into another room and had a discussion with one police officer about the purpose of plaintiff being there and, after being asked to leave by the officer, plaintiff left. Specifically, plaintiff gave the following description of his encounter with the police:

Q. Did you have any conversation with that police officer when you went into the room?

A. Yes.

Q. What was discussed during that conversation?

A. Just basically what I was there for. I told them I was just there to observe the hearing and then I told him I was a reporter. I showed him a copy of our newspaper with – I believe it was the one with the article about the Court.

Q. Did the officer say anything in response?

A. Well, after I explained what had happened that's when he went out and spoke with Mr. Margiotta. And then he came back in and said that they basically are saying it's a private thing, they're not linked to the Court. They're not part of the Court, I believe was the word, and that only people with cases before the Court were allowed to be in there.

\* \* \*

Q. After the police officer said this to you did you say anything in response?

A. Well, I said, "If it's a private thing, how do they have the right to force people to come before them?"

Q. Did the police officer say anything?

A. Yes. He said, "Why are you asking me?"

Q. Did you have any additional conversation with the police officer at that time?

A. Well, he then asked me to leave and that was it.

Q. When he asked you to leave, what did you do?

A. I left.

Q. You left the building.

A. I left the building.

(Pl.'s Dep., at 43-44.) Thus, it is clear from the undisputed record, including plaintiff's own deposition, that neither the court security officers nor the SCPD acted at any point on Margiotta's alleged direction that plaintiff be arrested. Instead, the police asked plaintiff to leave, and plaintiff left. There is simply no evidence, before or after Margiotta's comments, of a resulting Fourth Amendment seizure of any kind.[14]

Similarly, to the extent that plaintiff is also claiming that the fact that two security officers in the courtroom approached him "wearing a bulletproof vest and carrying a firearm . . ." (Compl. ¶ 9) made him believe he was not free to leave, the Court concludes that such a contention is legally flawed. The mere fact that officers questioning an individual have a firearm and vest is insufficient to allow a jury to find that the person is not free to leave and, thus, under arrest. *See Mendenhall*, 446 U.S. at 553 (questioning by the police is not enough to constitute a seizure if one is free to walk away). There is no evidence that the weapons were ever drawn. There is no evidence that their language or tone indicated that plaintiff was not free to leave. As

discussed above, there is no evidence that the officers did or said anything that would suggest to a person in plaintiff's situation that he was not free to leave. In fact, the undisputed evidence suggests exactly the opposite – that is, plaintiff concedes that the whole purpose of the security officer's conversation with him was not to restrain him or prevent him from leaving, but rather was to have him leave the courtroom. In other words, it was plaintiff who insisted on not leaving and, therefore, it absolutely defies logic for plaintiff to now suggest that, if plaintiff had decided at any point during this encounter to leave the courtroom, he would not have been permitted to do so because he was under arrest. It is abundantly clear from the undisputed facts in the record discussed above that the reason that plaintiff did not leave or did not ask to leave was not because he was under arrest, but rather because plaintiff was insisting on not leaving. *See, e.g., Hall v. Bates,* 508 F.3d 854, 857 (7th Cir. 2007) (granting summary judgment on Fourth Amendment claim and noting: "[plaintiff] does not explain why, if she wanted to leave, she didn't ask them whether she was under arrest. Had she done so, and one of the defendants had said yes, it would be plain that her constitutional right had been violated."). In particular, it is undisputed that plaintiff was asked on multiple occasions by different individuals to exit the courtroom on that date in the absence of a proceeding and he refused on each occasion until asked by a Suffolk County police officer. When asked by the police officer to leave the courtroom, plaintiff complied with the request. Thus, under these circumstances, any claim that the security officers' appearance created the impression that plaintiff was not free to leave is belied by the undisputed evidence regarding the totality of the circumstances, including their discussion with plaintiff that they wanted

---

[14]  Moreover, as noted *supra*, to the extent that plaintiff is suggesting that he was subject to a false arrest in connection with any conduct after the police arrived, neither Suffolk County nor its officers are even named as defendants in this case.

him to leave. *See, e.g., Flowers v. TJX Cos., Inc.,* No. 91-CV-1339, 1994 WL 382515, at *3 (N.D.N.Y. July 15, 1994) ("In the instant case, no genuine issue of fact exists as to whether plaintiffs suffered from a reasonable apprehension that they were not free to leave. Plaintiffs were not detained; at most they were expelled. Since plaintiffs can not argue that they were detained, they can not demonstrate that they were seized. Therefore, plaintiff's § 1983 claim is dismissed in so far as it is predicated on a violation of the Fourth Amendment.").

In short, plaintiff's claim – that he was "seized" under the Fourth Amendment because he was forced by defendants to remain in the courtroom – is absolutely contradicted by the fact that he wished to remain in the courtroom, that he absolutely refused to leave the courtroom, and that the whole purpose in defendants' speaking with him was to get him to leave the courtroom. There is absolutely no evidence in the record to suggest that plaintiff was under arrest or not free to leave the courtroom at any point on that date during his encounter with Margiotta, the court security officers, or the police officers. Instead, the undisputed evidence is that he was repeatedly asked to leave the courtroom and eventually did leave the courtroom. Under such undisputed facts, no reasonable jury can find that an arrest or detention took place and summary judgment in defendant's favor on that claim is warranted.[15]

---

[15] As discussed *supra* with respect to the First Amendment claim, there is no evidence that plaintiff was told that he was escorted from the courthouse and not permitted to return to the courtroom when proceedings were to take place; rather, the only evidence is that he was not permitted to be in the courtroom when no

### (4) Due Process Claim

Plaintiff also alleges a due process violation for a deprivation of his "life, liberty and property." (Compl. ¶ 41.) However, as set forth below, there is no evidence of a deprivation of a liberty or property interest. Accordingly, summary judgment on the due process claim is warranted.

The Fifth Amendment in and of itself pertains only to actions of the federal government. *See, e.g., Heath v. Highland Park Sch. Dist.,* 800 F. Supp. 1470, 1475 (E.D. Mich. 1992); *Three Rivers Cablevision, Inc. v. City of Pittsburgh,* 502 F. Supp. 1118, 1134 (W.D. Pa. 1980). However, the right to due process of law with respect to action by a state or any of its subdivisions is derived from the Fourteenth Amendment.

In the instant case, under a Fourteenth Amendment due process analysis, plaintiff has not alleged, and the record does not contain any evidence that plaintiff was deprived of a liberty interest. As discussed *supra,* he was never arrested or detained.

---

proceedings were occurring. However, even assuming *arguendo* that he was escorted from the building, no Fourth Amendment claim would exist under such circumstances. *See Sheppard v. Beerman,* 18 F.3d 147, 153 (2d Cir. 1994) (no Fourth Amendment seizure where allegation was that plaintiff was escorted out of courthouse by court officers); *see also Laverdi v. Jenkins Twp.,* No. 01-CV-3826, 2002 WL 31108910, at *2 (3d Cir. Sept. 19, 2002) ("[A]lthough submission to a show of authority can constitute a seizure even absent physical restraint, . . . here [plaintiff's] compliance with the officer's escort was insufficient to establish actual submission") (citation omitted).

Therefore, for same reasons this Court dismissed plaintiff's Fourth Amendment claims, there is no evidence to support the deprivation of a liberty interest under the due process clause. Moreover, there is no allegation or evidence of any deprivation of property suffered by plaintiff. Therefore, plaintiff's due process claim cannot survive summary judgment.[16]

(5) Equal Protection Claim

Plaintiff's complaint does not clearly set forth an equal protection claim, but rather simply recites the language of the Fourteenth Amendment. However, to the extent that he is attempting to assert an equal protection claim under the Fourteenth Amendment, such claim cannot survive summary judgment in this case because there is no evidence that he was treated differently than similarly situated individuals.

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985); *see also Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494 (2d Cir. 2001). A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229, 241-42 (1976). It is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor.

Plaintiff has not put forth any allegations in his complaint indicating that Plaintiff was treated differently by defendants than any similarly situated person. Moreover, there is no evidence in the record indicating any discriminatory motive by defendants. As defendants correctly indicate in their brief, and plaintiff does not dispute, plaintiff was the only non-Town employee present in the courtroom during the time he was asked to leave. (Def.'s Br. at 13.) Plaintiff did not allege that there was anyone else who was similarly situated as he, yet treated differently by the defendants with respect to any of the relevant events set forth in the complaint. Therefore, to the extent that plaintiff is attempting to assert an equal protection claim, such claim cannot survive summary judgment.

(6) Ninth Amendment Claim

Although plaintiff alleges a cause of action under the Ninth Amendment in a conclusory

---

[16] In addition, to the extent that plaintiff is attempting to allege some substantive due process violation from the alleged acts by defendant, no separate claim exists in the instant case under such theory. The Supreme Court has instructed that where a particular amendment "provides an explicit textual source of constitutional protection," that amendment controls the analysis rather than a "substantive due process approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Bryant v. City of New York*, 404 F.3d 128, 135 (2d Cir. 2005). The Court recognizes that a general due process claim is appropriate where a more specific source of protection is absent or open to question. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (finding substantive due process analysis was appropriate where Fourth Amendment did not apply to high speed police chase). However, in this instance, plaintiff's claims of false arrest and infringement on his right to free speech fall squarely within the protections of the Fourth and First Amendments, respectively. Accordingly, a substantive due process analysis is inappropriate.

fashion, such claim also cannot survive summary judgment because it does not apply to state actors and does not create separate, substantive rights for individuals.

The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. The Ninth Amendment is only applicable against federal, and not state, actors. *See Rini v. Zwirn*, 886 F. Supp. 270, 289-90 (E.D.N.Y. 1995) (Ninth Amendment has not been interpreted as being incorporated under the due process clause of the fourteenth amendment).

In addition, the Ninth Amendment is considered "a rule of construction" that does not give rise to individual rights. *See United States v. Bifield*, 702 F.2d 342, 349 (2d Cir.1983); *see also Clynch v. Chapman*, 285 F. Supp. 2d 213, 219 (D. Conn. 2003) (dismissing Ninth Amendment cause of action for failure to state a claim); *Rini*, 886 F. Supp. at 289-90 (dismissing Section 1983 cause of action based on a violation of the Ninth Amendment). Therefore, although the Ninth Amendment may provide the basis for recognition of un-enumerated rights, which themselves may be enforceable against a State under the Due Process Clause of the Fourteenth Amendment, the Ninth Amendment itself provides no substantive right. *See Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991) (dismissing the plaintiff's Ninth Amendment claim on the ground that "the ninth amendment does not confer substantive rights in addition to those conferred by other portions of our governing law"); *DeLeon v. Little*, 981 F. Supp. 728, 734 (D. Conn. 1997) (holding that "'the [Ninth Amendment] does not guarantee any constitutional right.'" (quotation omitted));

*Mann v. Meachem*, 929 F. Supp. 622, 634 (N.D.N.Y. 1996) (dismissing plaintiff's Section 1983 claim to the extent that it was based upon a violation of the Ninth Amendment because "[t]he Ninth Amendment is recognized as a rule of construction and does not protect any specific right.") (citation omitted).

As such, the Ninth Amendment is inapplicable here as a source of individual rights. Therefore, to the extent that plaintiff is attempting to assert an independent violation of the Ninth Amendment, summary judgment on such claim is warranted.

B. Section 1981 Claim

Plaintiff also alleges, pursuant to 42 U.S.C. § 1981, that defendants discriminated against him on the basis of race. However, the Court concludes that, based upon, among other things, plaintiff's concession that there is no evidence whatsoever supporting any racial discrimination claim, such claim cannot survive summary judgment.

Section 1981 provides, in relevant part, that:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all law and proceedings for the security of persons and property as is enjoyed by white citizens . . ."

42 U.S.C. § 1981(a).

Although Section 1981 does not provide an independent basis of relief, Section 1983 provides "a method for vindicating federal

rights elsewhere conferred," such as those conferred by Section 1981. *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Indeed, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) (emphasis added).

Although there is an allegation in plaintiff's complaint that plaintiff is of African descent, there is no evidence or allegations that any of the defendants discriminated against plaintiff due to his race. In fact, plaintiff's counsel admitted during oral argument that there was no evidence supporting any racial discrimination claim. (Oral Arg. at 30.) Thus, plaintiff has wholly failed to provide evidence for a basis for relief under Section 1981. Accordingly, summary judgment on the Section 1981 claim is warranted.

## C. Section 1985 Claim

Although plaintiff alleges that defendants conspired to deprive him of his civil rights under Section 1985, there is no evidence to support such a claim in the instant case.

Section 1985 provides in relevant part:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or cause to be done, any act in furtherance of the object of such

conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages . . . .

42 U.S.C. § 1985(3).

A conspiracy claim under 42 U.S.C. § 1985(3) has four elements: (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen. *See United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983). In addition, the conspiracy must be motivated by some class-based animus. *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

Plaintiff has alleged no facts in his complaint, and has provided no evidence in the record, indicating the existence of a conspiracy to interfere with his civil rights. Furthermore, as mentioned *supra*, the only allegation relating to race in plaintiff's complaint is one sentence stating that plaintiff is of African descent, and plaintiff's counsel admitted during oral argument that there was no evidence supporting any racial discrimination claim. (Oral Arg. Tr., at 30.) Therefore, there is no evidence to support a Section 1985 claim and summary judgment on such claim is warranted.

## D. State Law Claims

In addition to the §§ 1981, 1983, and 1985 claims, plaintiff asserts a number of state law claims.

"In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497 (MAT), 2007 U.S. Dist. LEXIS 41834, at *15 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "decline[s] to exercise supplemental jurisdiction over [plaintiffs'] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. N.Y-Presbyterian Hosp.*, 455 F.3d 118, 121-22 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial . . . the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608 (WK), 2002 U.S. Dist. LEXIS 12842, at *10-*11 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 42 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state claims, and dismisses such claims without prejudice.

## IV. Conclusion

For the reasons stated, defendants' motion for summary judgment on plaintiff's federal claims is GRANTED in its entirety. The Court declines to retain jurisdiction over plaintiff's remaining state law claims and dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 1, 2008
Central Islip, New York


* * *

The attorney for the plaintiff is Michael J. Kaper, Esq., The Coalition of Landlords, Homeowners & Merchants, Inc., 28 East Main Street, Babylon, New York, 11702. The attorney for the defendant is Geoffrey H. Pforr, Esq., Kral, Clerkin, Redmond, Ryan, Perry & Girvan, 496 Smithtown ByPass, Smithtown, New York 11787.